STATE OF TENNESSEE *Ex Rel.* BLOOMSTEIN *v.* SNEED.

1. CONSTITUTIONAL LAW. *Mandamus against State officer. Not maintainable. When.* A proceeding by *mandamus* to compel an officer of the State to do that which the Legislature has prohibited him from doing, is in effect a suit against the State, and was not maintainable prior to the act of 1855, (Code, sec. 2807), nor subsequent to the repeal of that act by the Legislature in 1865. It therefore follows that a tax collector cannot be required, by this form of action, to receive notes of the Bank of Tennessee, emitted after May 6th, 1861, in payment of relator's taxes, under the 12th section of the Bank charter, enacted in 1838, in the face of legislative instruction to the contrary, even though the notes were issued during the time that sec. 2807 of the Code was in force, that section being considered as an ordinary act of legislation in regulating the jurisdiction of the courts of the State, and not such an act as would so incorporate itself with the 12th section of the Bank charter as to constitute a part of the contract between the State and the holders of the notes.

Cases cited: Williams *v.* The Register of West Tennessee, Cooke, 218; M. &. C. R. R. *v.* The State and the Bank of Tenn., 3 Baxter, 395.

Statutes cited: Chapters 13, 44 and 118, acts of 1875.

2. SAME. *Obligation of contracts. Not impaired by laws prohibiting receipt of new issue Bank of Tennessee notes for taxes.* There is no obligation on the part of the present State government to receive the notes of the bank issued after the inauguration of the rebel State government, in payment of taxes due the State. For, although as between the bank and the holders, these notes are valid and protected from impairment through hostile State legislation, by the Federal Constitution, yet sec. 12 could only have been operative upon the bills or notes emitted dur-

State *v.* Sneed.

ing the existence of the illegal State government through the re-enact-
ment or tacit recognition thereof, by such State government, which
had no power to commit the State to the terms of the contract imposed
thereby for a period longer than its own existence. It was therefore
competent for the restored State government to repudiate these notes,
so far as its liability to take them for taxes was concerned, the guar-
anty of the illegal State government not having been under the pro-
tection of the Federal Constitution.

Case cited : The State and Watson, trustee, *v.* The Bank of Tenn. *et al.*,
5 Baxt., 1.

### FROM DAVIDSON.

Appeal from the Common Law Court at Nashville. Judge J. C. GUILD presiding.

R. McP. SMITH for the relator.

The ATTORNEY GENERAL for the defendant.

NICHOLSON, C. J., delivered the opinion of the court.

This is a petition by Jacob Bloomstein, in the common law court, for a peremptory *mandamus*, requiring Thomas H. Sneed, tax collector for Davidson county, to receive from him $130 in the notes of the Bank of Tennessee, issued after May 6th, 1861, in payment of his State taxes for the year 1872. The attorney general for the State assigned various causes of demurrer, which were sustained by Judge Guild, and the petition dismissed.

The first question raised by the demurrer is, as to the jurisdiction of the common law court to grant the writ of *mandamus*. The petitioner bases his application upon a right secured to him by section 12 of the charter of the Bank of Tennessee, which provides,

that "the bills or notes of the said corporation, ori-
ginally made payable, or which shall have become
payable on demand, in gold or silver coin, shall be
receivable at the treasury of the State, and by all tax
collectors or other public officers, in all payments for
taxes or other moneys due the State." It is assumed
that by virtue of this provision of the bank charter,
the State entered into a contract with every holder
of any of the bills or notes of the bank, by which
she bound herself that the same should be received
by her tax collectors, in payment of taxes due the
State; and that the notes so tendered · to Sneed, as
tax collector, were issued by the bank.

It is further insisted, that the obligation of this
contract is protected from impairment, by the Consti-
tion of the United States.

These positions are sustained by the holding of the
United States Supreme Court in a case in 8 Wallace,
in which case, this same provision of the bank charter
was involved. In that case the notes of the bank
tendered had been issued prior to the 6th of May,
1861, and no question as to the jurisdiction of the
State court was raised. It was decided that the State
was bound by her contract, to receive the notes of
the bank issued before May 6th, 1861, in payment of
taxes, but as to the notes issued subsequent to that
date, the question was waived.

Assuming, then, for the present, that the contract
entered into by the State, by reason of the 12th sec-
tion of the bank charter, includes the notes tendered
by petitioner to the tax collector, the question is,

State *v.* Sneed.

Did the common law court have jurisdiction to require the tax collector to receive them?

It is a legal as well as political axiom, that no sovereign government can be sued in its own courts, except by its own consent. By our Constitution, "suits may be brought against the State, in such manner and in such courts, as the Legislature may, by law, direct." But this constitutional provision remains a dead letter, until some mode of proceeding is pointed out by the Legislature. *Williams* v. *The Register, etc.,* Cooke, 218. At the time the bank charter was passed, in 1838, the Legislature had pointed out no mode, by which the State might be sued in the courts. There was then at that time no statute of the State authorizing the enforcement of this contract in the courts, and consequently no such statute entering into that contract, and constituting part of its obligation. The holders of the notes could only rely upon the good faith of the State, through legislative enactments, for the enforcement of the contract. It is clear, therefore, that while the Constitution of the United States protected the obligation of the contract from impairment by the State, there was no law furnishing a remedy for its enforcement, which constituted any part of the obligation of that contract, and the State was under no obligation to furnish any other remedy than that then existing.

It is true, however, that in 1855, the State gave her consent that suits might be brought against her as against individuals; and this law remained in force until 1865, when it was repealed, and since that time

no law has been enacted authorizing suits against the State. It was during this period that the act of 1855, carried into the Code, sec. 2807, was in force, that the notes of the bank now in controversy, were issued; and down to its repeal in 1865, the holders of the notes so issued had the right to enforce the contract of guaranty, contained in the 12th section of the bank charter.

But the act of 1865 was an ordinary act of legislation, regulating the jurisdiction of the courts of the State, and furnishing a new remedy by way of suits against the State. This act contained no stipulations, that it might not be afterwards modified or repealed, if in the judgment of the Legislature, its modification or repeal should be demanded by the public interests. Nor could such a contract be implied from the passage of the act of 1855. As held by the Supreme Court of the United States, in the case of *Beers* v. *The State of Arkansas*, 20 How., 530, it was competent for the Legislature to repeal the act of 1855 altogether, and put an end to the jurisdiction of our courts in suits against the State; and in exercising this power, the State would violate no contract with the parties. It would be merely regulating the proceedings in her own courts, and limiting or withdrawing the jurisdiction she had before conferred, by the passage of the act of 1855.

It was said in the case of *Butler* v. *Pennsylvania*, 10 How., 402, that "the contracts designed to be protected by the 10th section of the 1st Art. of the Federal Constitution, are contracts by which perfect rights,

State *v.* Sneed.

certain, definite, fixed private rights of property are vested. These are certainly distinguishable from measures or engagements adopted or undertaken by the body politic, or State government for the benefit of all, and from the necessity of the case, and according to universal understanding, to be varied or discontinued as the public good shall require."

It was upon these principles that we held, at the present term, in the case of the *M. & Ch. R. R. Co.* v. *The State and the Bank of Tenn.*, that the State was not liable to be sued for deposits made by the R. R. Co. in the Bank, in 1863.

But the Legislature has not stopped by simply repealing the act of 1855, (Code, sec. 2807), which authorized suits to be brought against the State. In 1873, by chap. 13, it was enacted, that "no court in the State has, nor shall hereafter have, any power, jurisdiction or authority to entertain any suit against the State, or against any officer of the State, acting by authority of the State, with a view to reach the State, its treasury, funds or property," etc.

By chap. 44 of the acts of 1873, it was enacted that whenever any tax-payer conceives that the taxes demanded of him are unjust or illegally demanded, his only remedy is to pay the taxes under protest, and afterwards sue the collector; and no officer of the State is to be "subjected to any suit for a refusal on his part to accept in payment of revenue to the State, any kind or description of funds, or securities, or papers, other than such as he may be authorized and required to receive for the time being, by law."

By chap. 118 of the acts of 1873, it is provided, that "tax collectors shall receive in discharge of the taxes and other dues to the State, bank notes of the Bank of Tennessee, known as old issue, warrants on the treasury, legally outstanding, gold, silver, national bank notes, United States legal tender notes, and nothing else."

It is manifest, that if these provisions of the statutes are valid, the common law court had no jurisdiction to entertain the application for a *mandamus.* The prohibition is explicit against the receipt of the notes in controversy by the tax collectors, and against the power or jurisdiction of any court in the State to entertain a suit against such collector for refusing to receive the new issue for taxes due the State.

It is insisted for the petitioner, that these provisions of the statutes impair the obligation of the contract of guaranty, by which the State agreed to receive the notes of the Bank of Tennessee in payment of taxes, for the reason that they furnish no remedy by which the holder of the notes can enforce the contract by suit. This position rests upon the assumption, that before these statutes were passed, the holders had the remedy by *mandamus,* which being taken away, they are now without any, or at least without any adequate remedy. The error of this argument is, in assuming that the holders of the notes have ever had any remedy by suit, since the repeal of sec. 2807 of the Code. As against the State, there is no common law remedy by *mandamus* without the consent of the State. There was no such remedy when the State entered into the

contract, and there has been none since the repeal of the section 2807 of the Code.

We have already seen that even while the section 2807 was in force, that it did not so incorporate itself with the 12th section of the bank charter, as to constitute a part of the contract between the State and the holders of the notes. It was no more than a privilege or permission granted by the Legislature to the note-holder, which was subject to be withdrawn whenever the public interests required it. The case of *Williams* v. *Register of West Tennessee,* Cooke, 214, is conclusive of this question. In that case, an application was made for a *mandamus* to compel a register to issue a grant, although the Legislature had prohibited its issuance. It is said by the court, that to grant a *mandamus* in this case, would, in effect, sanction the idea that the State may be sued. It was held, that the act of the Legislature forbidding the issuance of the grant was void, because of its repugnance to the Constitution, yet the court say, they cannot perceive that they possess any physical power to compel the State to issue the grant. The reason was, that the disposition of the soil was an attribute of sovereignty belonging peculiarly to the Legislature. So in the present case, the providing of revenue for the State is an attribute of sovereignty, and by the Constitution the exercise of this attribute of sovereignty belongs to the Legislature. That power has forbidden its revenue officers to receive the new issue, in payment of taxes, and has withheld from the courts any

jurisdiction to entertain a suit for refusal to receive such payment.

It follows, that even if the statutes forbidding the receipt of the new issue by the tax collectors was unconstitutional, yet the common law court had no jurisdiction to compel its reception. Much less does such jurisdiction exist, when the repeal of the act authorizing suits against the State, and the forbidding of any suit against the collectors for refusing to receive it, does not violate that provision of the Federal Constitution, which protects the obligation of contracts from impairment by State legislation.

We have, thus far, considered the case upon the assumption, that the 12th section of the bank charter constitutes a contract between the State and the holders of the notes of the bank, which is valid and binding, as between the State and the holders of the notes, issued after the 6th of May, 1861. In this view our inquiry has been confined to the question of jurisdiction in the courts, to entertain the suit. It remains now to consider, whether there is any obligation on the present government of the State to receive the notes issued by the bank, during the existence of the rebel State government?

We have held in the case of the *State and Watson* v. *The Bank and others*, that as between the bank and the holders of the new issue, the notes were valid and binding on the bank. It does not follow, that as between the State and the holders of this issue, there is any obligation on the part of the State, to receive the notes in payment of taxes due to the State government.

State *v.* Sneed.

When the Bank was chartered in 1838, the State undertook to receive the issues of the Bank in payment of taxes assessed for the support of the State government, then in operation. That State government, however, was supplanted by the military *de facto* government which was inaugurated by the Legislature, and carried out by a majority of the people in 1861, in the acts by which it was attempted to separate the State from the Federal Union, and to declare its independence. These acts were invalid and void, so far as they were intended to affect or to change the relation of the State to the Federal Union; but they were effectual, for the time, in expelling the authority of the United States government and in setting up a new local government, in the place of the State government supplanted. The State remained in the Union, and the Constitution of the United States continued to exist and to operate within the State during all the time that the usurped government was in existence. The laws which had prevailed before the attempted revolution, so far as they were not expressly repealed or changed by the Legislature of the *de facto* government, continued in force, as between the citizens of the new government, and their private contracts continued under the protection of the Federal Constitution.

In this way the charter of the Bank continued in force, and its transactions, as a body corporate, were valid and binding, as between the Bank and their dealings with it. Its capacity to receive deposits, and issue a circulation, was the same after as before

the inauguration of the new government. The con-
tracts made by the Bank with the citizens dealing
with it, were protected from impairment by the Fed-
eral Constitution as effectually, during the existence of
the usurped government, as before. Hence, it was
held by this court, in *The State and Watson* v. *The
Bank*, that the acts of the Legislature of the restored
State government, by which it was sought to repudi-
ate the issues of the Bank, were null and void, be-
cause they impaired the obligation of contracts between
the Bank and holders of its notes.

But as the State was held not to be a party to
that suit, no opinion was expressed as to the power of
the Legislature of the restored State government, to
repudiate the obligation of the State, under the 12th
section of the Bank charter, to receive the notes of
the Bank, issued during the usurped government, in
payment of taxes assessed to support the restored
government of the State.

It is well settled, that all legal and valid con-
tracts between citizens of the rebel States, were so
far under the protection of the United States Consti-
tution, during the prevalence of the rebellion, that
they could not be impaired by the legislation of the
restored State governments. The question presents itself,
was the contract of guaranty between the State and
the holders of the new issue, arising under section 12
of the Bank charter, under the protection of the
Federal Constitution during the rebellion? If so,
then the act of the Legislature repudiating that issue

was invalid—if not, then that act was legitimate and effective.

The contract was, that the State would receive the notes of the Bank in payment of taxes due the State. We are to regard the 12th section of the Bank charter as having been re-enacted, or tacitly recognized as in force, by the new government, inaugurated in May, 1861. It was therefore an attempt, by the usurping government, to bind the State to guaranty the notes of the Bank issued during the existence of the new government, by agreeing to receive them for taxes assessed to support the usurping government. But it has been settled by repeated judicial decisions, that the political status of the State was never affected or changed by the action of the usurping Legislature, but that she continued a member of the Federal Union, under the guarantees of the Federal Constitution. It has been also repeatedly decided, that the government inaugurated in the place of the legitimate State government, was only operative as a military or *de facto* civil government, but in as far as it was opposed to Federal government, or to the legitimate State government, that it was an illegal usurpation. To hold, therefore, that the contract, raised by the 12th section of the Bank charter, was a valid obligation on the State, protected from impairment by the Federal Constitution, would be to hold, that the Constitution protected a contract which bound the State to guarantee the payment of taxes raised to sustain a government in open hostility to the Federal Constitution and the Federal Union. It follows necessarily,

that the usurping government did not and could not commit the State to a contract, which should continue any longer than the usurping government itself continued, and such contract could not be under the protection of the Federal Constitution. Although the notes issued by the Bank might be binding, as between the Bankand the holders thereof, they could not be made the basis of a contract between the State and the holders thereof, by which the State would be bound to receive them for taxes due the State, after the usurped government should cease to exist, and the legitimate government be restored. It follows that because the contract arising under the 12th section of the Bank charter, during the existence of the usurped State government, was not under the protection of the Federal Constitution, it was competent for the Legislature of the restored State government, to repudiate the alleged contract, and refuse to receive the notes in payment of taxes assessed to support the restored egitimate government. The legislature of the usurping government had no power, by re-enacting the 12th section of the Bank charter, to impose upon the State an obligation which the Legislature of the restored legitimate State government would be bound to carry out. It follows that there was no error in the refusal of the court below to grant a peremptory mandamus.